**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:11CV139-RLV**

| | | |
|---|---|---|
| **MARX INDUSTRIES, INC.** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **CHESTNUT RIDGE FOAM, INC.** | ) | |
| **Defendant/Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MTJ AMERICAN, LLC,** | ) | |
| **Third-Party Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the parties' cross-motions for summary

judgment. (Docs. 48, 50, 52, 54). The Court takes up the dispositive motions following the

parties' failed attempts to memorialize their "agreement in principle to settle the case," which

was announced to this Court on February 28, 2014 immediately prior to commencement of the

March 2014 Trial Term.[1] (Doc. 92).

Defendant / Third-Party Plaintiff Chestnut Ridge Foam, Inc. ("CRF") also moves to

strike affidavits submitted by Mark Kiser ("Kiser"), President of Marx Industries, Inc. ("Marx")

and Member Manager of MTJ American, LLC ("MTJ") in connection with the summary

judgment motions. (Doc. 64).

---

[1] The fact that the parties were ultimately unsuccessful in their attempts to reduce their settlement agreement to writing is representative of the litigation as a whole. Counsel apparently had entirely different understandings as to what that "agreement in principle" consisted of and when documentation of the agreement was to be prepared and in final form. CRF's counsel represents that there were four sets of draft settlement agreements and accompanying transactional documents exchanged between February 28, 2014 and March 26, 2014 and that counsel discussed "a restructuring of the settlement parameters" via telephone on March 28, 2014, all to no avail.

Plaintiff Marx and Third-Party Defendant MTJ continue to seek additional discovery. (Docs. 97, 98). In conjunction with their filing advising the Court of the failed settlement attempt, Marx / MTJ seek leave of the Court to depose prospective trial witnesses associated with Defendant (suggesting that trial subpoenas had issued and "trial depositions" are necessary in the event the prospective witnesses are unavailable when the trial is re-calendared). Id.

The motions are fully briefed and ripe for disposition by the Court.

The case has been rescheduled for trial during the January 2015 Trial Term in the Statesville Division.

## I. Nature of the Case

Plaintiff Marx is incorporated in North Carolina, with its principal place of business in Granite Falls, North Carolina.

Defendant / Third-Party Plaintiff CRF is a Pennsylvania corporation with its principal place of business in Latrobe, Pennsylvania.

Third-Party Defendant MTJ is a limited liability company organized under the laws of the State of North Carolina with its principal place of business in Granite Falls, North Carolina.

Marx and MTJ represent that MTJ is a separate and distinct entity from Marx.[2] Marx manufactures foam while MTJ manufactures mattresses with the foam produced by Marx as a primary material. Marx / MTJ admit to common ownership and "some degree [of] common management." (MTJ Answer, ¶ 11). Mark Kiser, President of Marx and a Member Manager of MTJ, serves both entities in different capacities.

According to CRF, it has been engaged in the manufacture of flame-resistant foam since 1986, has developed and refined its proprietary manufacturing process over the course of more

---

[2] CRF asserts that MTJ is an "affiliate" of Marx and that "the two entities share common ownership, office space, and management."

than twenty-five years, is a leader in the industry, and occupies a significant market position. (CRF Counterclaim & Third-Party Complaint, ¶¶ 12−15). CRF sells its products within the private and public sectors, namely, within the aerospace, transportation, military and institutional sectors, as well as extensive sales to correctional facilities and state and local corrections departments throughout the United States. (CRF Counterclaim & Third-Party Complaint, ¶¶ 13−15). According to CRF, CRF employees John J. McManamy and Carl M. Ogburn began to develop plans for a correctional mattress with a transparent cover for the detection of contraband in early 2002.[3] (Doc. 55 / Exh. 2 / McManamy Decl., ¶ 3). Approximately nine years later, on November 15, 2011, McManamy and Ogburn (and assignee CRF), obtained U.S. Patent No. 8,056,169 (the '169 Patent) entitled, "Institutional Mattress and Pillow Composite with Transparent Covering." (Doc. 55 / Exh. 1 / '169 Patent).

It is undisputed that "MTJ offers mattress products to the "correctional industry" and is likely a competitor [of CRF]." (MTJ Answer, ¶ 20). Marx/MTJ admit selling foam mattresses with clear covers since November 15, 2011. (Exh. 6 / Response to Requests for Admission 10−13). The two MTJ products relevant here are MTJ's "Clear Safe Detention Mattress" and "Fire Safe Detention Mattress."

This lawsuit stems from Marx's 2011 purchase of a piece of equipment Marx has used to manufacture foam and its subsequent operation by Marx / MTJ. Prior to the initiation of this action by Marx, CRF commenced a lawsuit in Pennsylvania against another foam manufacturing company, Innovative Foam Products ("IFP"). In the Pennsylvania suit, CRF asserted that IFP misappropriated trade secrets regarding CRF's process and operation of certain equipment used

---

[3] In October 2004, McManamy and Ogburn assigned all of their "right, title, and interest" in and to each of the patent applications, including "inventions and improvements therein disclosed" to CRF. (Doc. 55 / Exh. 3).

to manufacture foam products. As a result of IFP's insolvency, Marx purchased the equipment previously belonging to IFP – the same equipment at issue in the earlier Pennsylvania litigation.[4] (Compl. 12, 13.)

In connection with the equipment purchase, Marx alleged it entered into a "Confidential Agreement" with IFP in which IFP represented to Marx that CRF "does not possess trade secrets relating to the equipment." (Compl. 25.) After Marx/MTJ failed to produce a copy of the alleged agreement, the Magistrate Judge issued an Order compelling production in January 2014. (Doc. 73). The inability of Marx/MTJ to produce the Agreement was a topic of the several formal discovery disputes litigated before this Court and the purported Agreement continues to be a subject of debate between the parties.[5]

On March 17, 2014, Marx/MTJ produced an *unexecuted* copy of a document entitled, "Confidential Discussion Document − Representations, Indemnity and Confidentiality Agreement."[6] (Doc. 94 / Exh. 1). The Confidential Discussion Document ("CDD") expressly represents its purpose, to enable IFP and Marx to join forces without CRF's knowledge. (Doc. 94, at 1) ("Whereas, the parties wish that Chestnut[CRF] not be aware of the terms of this Agreement or that the parties are working together out of a concern that Chestnut will file frivolous actions against Marx . . . ."). In the CDD, "IFP warrants that it is not aware of any patents or trade secrets that Marx might infringe by using IFP's work resulting from this Agreement." (Doc. 94, at 3, ¶ 6). The document includes a provision that would require IFP to

---

[4] Marx purchased the equipment from Georgia Coastal Bank, IFP's secured creditor. (Compl. 9, 10, 14.)

[5] *See* CRF's most recent Motion to Compel, filed February 26, 2014, which has not been ruled on due to the parties' reported settlement. (Doc. 90 / Exh. 3).

[6] Signature lines were provided on the last page of the document for: Mark Kiser, President and signator for Marx Industries, Inc.; Innovative Foam Products, LLC, Harvey Roth, and Thomas Munchinski. (Doc. 94 / Exh. 1, 4).

indemnify Marx from and against any and all liabilities arising from or relating to the lawsuit between IFP (a non-party to the instant lawsuit) and CRF, the equipment that was the subject of CRF's demands to IFP (the same equipment later purchased by Marx), the CDD, and any work performed by IFP relating to the CDD. (Doc. 94 / Exh. 1). To date, no executed copy of any written agreement has been produced by Marx/MTJ.

Defendant CRF, believing that its "competitively sensitive operational information may have been transferred to Marx," wrote the President of Marx on April 22, 2011, and asked Marx "to confirm that [Marx] did not intend to use [CRF's] trade secrets to compete unfairly against Chestnut Ridge." (Doc. 9, at 2. / Compl. Exh.2). On May 5, 2011, Marx, through counsel, responded to the letter from CRF, asking for clarification. (Compl. 17 / Exh. 3). On May 18, 2011, counsel for CRF sent a second letter, detailing CRF's concerns and threatening that CRF was willing to "take any and all necessary legal actions to protect its confidential proprietary information and trade secrets." (Doc. 1, at 21. / Comp. Exh. 4).

On August 31, 2011, Marx filed suit in the North Carolina General Court of Justice, Caldwell County Superior Court, against CRF seeking declaratory judgment pursuant to the North Carolina Uniform Declaratory Judgment Act, N.C. Gen. Stat. §§ 1–253 *et seq.* (Doc. 1). Marx seeks a declaratory judgment holding that use of the foam manufacturing equipment purchased from IFP's creditor did not constitute a misappropriation of trade secrets purportedly held by any competitor (*i.e.*, CRF). Id. Marx also seeks damages from CRF for unfair competition, unfair trade practices under N.C. Gen. Stat. § 75-1.1, and tortious interference of Marx's alleged agreement with IFP. Id.

On September 30, 2011, CRF removed the suit to this federal district court based upon diversity of citizenship pursuant to 28 U.S.C. §§ 1441(a) and 1332. (Doc. 3). CRF

simultaneously filed a Motion to Dismiss pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. CRF argued that personal jurisdiction over CRF was lacking and that there was no controversy sufficient to support a claim for declaratory relief. Id. The parties were permitted to conduct limited discovery on the question of jurisdiction. (Doc. 12).

On October 12, 2012, the Court denied CRF's Rule 12 Motions. (Doc. 21).

CRF filed its Answer on October 26, 2012. (Doc. 22). CRF simultaneously asserted Counterclaims and a Third-Party Complaint alleging patent infringement of the '169 Patent by Marx/MTJ. (Doc. 22 / Counterclaim & Third-Party Compl., ¶¶ 6−30). CRF also brought Counterclaims against Marx alleging two violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, for selling an infringing product and for bringing an improper lawsuit against CRF. (CRF Counterclaim & Third-Party Compl., ¶¶ 31−36, 41−48). In addition, CRF brought Counterclaims against Marx alleging unjust enrichment, unfair competition, violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and a civil conspiracy. (CRF Counterclaim & Third-Party Compl., ¶¶ 37−40, 49−53, 54−60, 61−66).

In its Third-Party Complaint, CRF brought identical causes of action against MTJ with the exception of the North Carolina Unfair and Deceptive Trade Practices claim based upon the propriety of bringing the instant lawsuit (Count Four). (Third-Party Compl.).

On January 15, 2013, Plaintiff Marx and Third-Party Defendant MTJ jointly filed an Answer.[7] (Doc. 29). MTJ advanced four affirmative defenses to CRF's claims: 1) invalidity of

---

[7] The pleading, entitled, "Third Party Defendant's Motion To Dismiss, Answer To Counterclaims And Affirmative Defenses," is expressly identified as the responsive pleading for Third-Party Defendant MTJ. However, the admissions, denials, and factual statements within the Answer are made on behalf of both Marx and MTJ, who are also represented by the same attorney, Attorney Matthew Rogers. The responsive pleading includes a motion to dismiss pursuant to Rule 12(b)(6) that was never pursued or supported by a separate memorandum of law and thus never perfected as a motion to be considered by the Court. See L.Cv.R. 7.1(c).

the '169 Patent pursuant to 35 U.S.C. § 103(a) (obviousness); 2) laches; 3) failure to mark products or identify patent registration and / or failure to police patent ownership rights; and 4) lack of willfulness. (Doc. 29, 8–9).

The parties unsuccessfully mediated the case on October, 8, 2013. (Doc. 47).

On October 15, 2013, MTJ requested that it be allowed to amend its pleading to include counterclaims against CRF alleging: 1) bad faith violations of Section 43(a) of the Lanham Act; and 2) defamation and unfair trade practices. (Doc. 44, 6–9). The Magistrate Judge denied MTJ's motion and opined that to allow an amendment to the pleadings within such close proximity to trial would be "unduly prejudicial" to CRF. (Doc. 73, 12). MTJ appealed the Magistrate Judge's decision to this district judge. (Doc. 80). MTJ's objections were overruled. (Doc. 89).

Marx seeks summary judgment in its favor on all of the matters raised pursuant to N.C. Gen. Stat. §§ 1–253 *et seq*.[8] (Doc. 48). Marx also seeks summary judgment in its favor with respect to the Counterclaims alleged by CRF against Marx. (Doc. 48, ¶¶ 9–12).

CRF seeks summary judgment in its favor denying Marx's request for declaratory

---

[8] Marx makes no small request as it seeks declaratory judgment on the following: 1) CRF did not protect trade secrets via contracts; 2) CRF does not own trade secrets preventing disclosure by IFP of information which would prevent use of Equipment at issue; 3) CRF cannot prevent IFP or others from working for Marx; 4) Marx is not subject to Pennsylvania's Uniform Trade Secrets Act; 5) CRF's failure to pursue injunctive relief relieves Marx from any potential liability relating to the claims in Exhibits 2 and 4; 6) Marx's use of the Equipment to manufacture foam is not unfair or a misappropriation of NC's Trade Secret Protection Act; 7) Existence of any legal prohibition on third parties performing in accordance with the "Confidential Agreement" entered into by Marx and IFP / Harvey Roth ; 8) CRF is unlawfully using the threat of litigation pursuant to Pennsylvania law in attempt to monopolize market for fire retardant foam; 9) CRF is using its inequitable position of power to prevent and delay entry of competitive products by suing potential competitors; 10) CRF uses the threat of litigation to tortiously interfere with contracts between Marx and Harvey Roth, and with the prospective business of Marx and third parties; 11) CRF's threat of lawsuit against Marx, and prosecution of frivolous lawsuits against IFP, is intended to harm competition and is in and affecting commerce in the State of NC; 12) CRF has a practice and pattern of threatening and filing lawsuits in Pennsylvania without jurisdictional bases; and 13) Chestnut's conduct amounts to anticompetitive behavior under NCGS § 75-1.1. (Doc. 1, ¶¶ 29–31, 33–35, 38–44).

judgment in its entirety. (Doc. 52). CRF only seeks a ruling on liability with respect to the alleged patent infringement.[9] (Doc. 55, 9 n. 1).

MTJ joins Marx in contending that CRF's patent infringement claim fails as a matter of law. (Doc. 50). MTJ challenges CRF's infringement claim as well as the validity of the '169 Patent. Since Marx and MTJ advance identical legal arguments, and CRF treats the two entities as one (with one exception – Count IV), their motions are likewise considered as a joint motion by the Court.[10]

## II.    Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010).  In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).  A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325.

---

[9] CRF explains that the record concerning its patent infringement claim has not been fully developed and concedes that "the specific equitable and legal relief to which it is entitled will be the subject of a separate hearing or other proceeding." (Doc. 55 at 9, n. 1).

[10] In doing so, the Court does not opine as to the status or characterization of the relationship between Marx and MTJ.

Since the parties have filed cross-motions for summary judgment and / or partial summary judgment, the Court reviews each motion separately on its own merits. *See Rossignol v. Voorhaar,* 316 F.3d 516 (4th Cir. 2003) (internal citation omitted); *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351 (4th Cir. 2011) (internal citations omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing the motion. *Rossignol,* 316 F.3d at 523 (internal citation omitted).

Because the parties' competing summary judgment motions stem from the need to determine the proprietary nature of CRF's intellectual property rights, including U.S. Patent No. 8,056,169 (the '169 Patent), the undersigned will begin by analyzing the parties' respective proprietary interests.

**III.      Discussion**

**A.  Patentability & Validity of the '169 Patent, 35 U.S.C. §§ 271, 281–85**

On November 15, 2011, CRF obtained the '169 Patent entitled, "Institutional Mattress and Pillow Composite with Transparent Covering." (Doc. 55 / Exh. 1).  There are three claims asserted within the '169 Patent.  Claim 1 is independent.  Claims 2 and 3 are derivative of Claim 1.  The '169 Patent protects the following:

> **Claim 1:**  A composite mattress for use in confinement facilities and institutions comprising:
>
>> A flexible, compressible polymeric foamed filling material, cotton, polyester or synthetic batting formed in the shape of a mattress, and
>> A pliable transparent flame retardant polymeric cover encapsulating said filling material wherein said polymeric cover material is fluid resistant, anti-microbrial and UV resistant and includes a nylon, polyester or similar open weave fabric support material, wherein said mattress is not inflatable.

**Claim 2:** The composite mattress of Claim 1 wherein the pliable transparent polymeric cover material has a degree of clarity for permitting visual detection, location, and identification of contraband hidden under the cover.

**Claim 3:** The composite mattress of Claim 1, including at least one pillow, wherein the pillow is positioned at one end of the mattress within the transparent polymeric cover material.

('169 Patent).

## 1. Presumption of Validity

Pursuant to Title 35, United States Code, Section 282(a):

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

35 U.S.C. § 282(a)(2011); *Black and Decker Mfg. Co. v. Sears, Roebuck and Co.*, 679 F.2d 1101, 1103 (4th Cir. 1982) ("Once a patent is issued it is entitled to a strong presumption of validity . . . .").  This presumption of validity stems from recognition *[by the legislature]* that the Patent Office possesses the requisite expertise and experience in passing upon a patent.  *See Black and Decker Mfg. Co.*, 679 F.2d at 1103 n. 7 (quoting *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1053 (4th Cir. 1976), cert. denied, 492 U.S. 980 (1976)).

## 2. Invalidity

Notwithstanding the presumption of validity that attaches upon issuance of a patent, defenses to a claim of alleged infringement include:

(1) "Noninfringement, absence of liability for infringement or unenforceability; and
(2) Invalidity of the patent or any claim in suit on any ground specified . . . as a condition for patentability."

35 U.S.C. §§ 282(b)(1) and (2). The conditions for patentability are that the invention be novel, nonobvious, and fully and particularly described. *See* 35 U.S.C. §§ 102, 103, and 112.

"Because a patent is presumed to be valid, the evidentiary burden to show facts supporting a conclusion of invalidity is one of ***clear and convincing evidence***." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1345 (Fed. Cir. 2005) (emphasis provided).

Before questions of validity and infringement can be reached, the Court must first determine what the '169 Patent actually covers, or what is patented. *See e.g., Bell Atl. Network Servs, Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (describing infringement as a two-step process, the first step requiring the Court to construe the claims and determine the scope of the patent). Then, the trier of fact must judge whether the claims as properly interpreted cover the accused device or process. *Id.*; *see also Witco Chem. Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545 (Fed. Cir. 1986).

### 3. Claim Construction

The parties' summary judgment arguments require the Court to construe Claim One (or certain terms) within the '169 Patent.[11] Claim construction is a matter of law, to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387−88 (1996).

Claim construction is typically facilitated by what is termed a "*Markman* hearing." "The purpose of a *Markman* hearing is to ascertain the meaning of a patent's claims so that it is clear precisely what has been patented and, by consequence, the protections the patent therefore affords the patent holder." *Spiroflow Syss., Inc. v. Flexicon Corp.*, WDNC No. 3:02CV70 (Keesler, J.) (internal citations omitted); *see also Bell Atl. Network Servs, Inc.,* 262 F.3d at 1267. In this case, the '169 Patent was introduced into the litigation by way of CRF's Third-Party

---

[11] Marx / MTJ expressly state, "This is a matter of claim construction and undisputed fact." (Doc. 61, 2).

Complaint in 2012, yet there was no request made for claim construction or for a *Markman* hearing prior to summary judgment briefing.[12]

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (*citation omitted*). The Court should give the disputed claim terms "their ordinary and accustomed meaning as understood by one of ordinary skill in the art." *Bell Atl.*, 262 F.3d at 1267. A person of ordinary skill in the art is deemed to read the claim terms not only in the context of the particular claims in which the disputed terms appear, but also in the context of the entire patent, including the specification and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

The claims of the patent "provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Specifically, the context in which a term is used within the claim, as well as the usage of that term in other claims of the patent, can be valuable in ascertaining the meaning of a particular claim term. *Id*. The ordinary meaning of a claim term must be viewed within "the context of the written description and the prosecution history" − not a vacuum. *DeMarini Sports, Inc. v. Worth*, 239 F.3d 1314, 1324 (Fed. Cir. 2001).

The specification of the patent can be highly instructive in construing the patent claims.

---

[12]  The Western District of North Carolina promulgated Local Patent Rules, effective March 31, 2011. Under the Local Patent Rules, P.R. 4.3(C) and P.R. 4.6 contemplate that the parties will advise the Court within their Joint Claim Construction and Preliminary Statement as to whether a Claim Construction Hearing is necessary. In this case, the parties have not submitted the patent infringement issue to the prescribed Claim Construction Proceedings set out in the Local Patent Rules. P.R. 4.1−4.6. Nonetheless, since the parties have briefed their respective positions on claim construction in conjunction with their summary judgment filings, the Court is in a position to construe the '169 Patent without conducting a *Markman* hearing.

*Vitronics*, 90 F.3d at 1582.  In fact, the specification is usually dispositive, as "it is the single best guide to the meaning of a disputed term."  *Id.*; *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).   As such, the Federal Circuit has stated that it is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."  *Phillips*, 415 F.3d at 1317.

In addition to consulting the specification, the Court also may examine the patent's prosecution history in construing the terms of the claims.  *Markman*, 52 F.3d at 980.   "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Phillips*, 415 F.3d at 1317.  The prosecution history also may be helpful in determining whether the inventor disclaimed any particular interpretation during the prosecution of the patent.  *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).

In addition to examining the intrinsic evidence, the Court is also authorized to consider certain extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d at 980.  Specifically with respect to expert testimony, the Federal Circuit has noted that such testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  *Phillips*, 415 F.3d at 1318.  The Federal Circuit has cautioned, however, that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."  *Id.*

**b.**

In light of the parties' respective arguments concerning infringement, claim construction

focuses on the meaning of the term "inflatable" for purposes of the '169 Patent.

### i.     Claim Language

The claim language provides guidance as to proper construction. Claim 1 protects a "composite mattress" with a core made of "a flexible, compressible polymeric foamed filling material, cotton, polyester or synthetic batting" and forming the shape of a mattress.[13] ('169 Patent, Column 4, Lines 1−3). Although flexible and compressible, Claim 1 of the '169 Patent describes a solid core mattress.

### ii.     Specification

The specification provides context by identifying the relevant field as well as the objectives of the '169 Patent. The "Field Of The Invention" states that the invention embodied within the '169 Patent:

> "relates to a confinement facility mattress composite having an integrated pillow and more specifically to a composite mattress and pillow having a pliable transparent polymeric covering which does not compromise fire retardancy or comfort and is designed to prevent concealment of contraband items."

('169 Patent, 1, Field Of The Invention). According to the "Background Of The Invention" ("Background") the existing institutional bedding "does not prevent the concealment of contraband items . . . for confinement facilities."[14] ('169 Patent, 1, Background). The need for an improved mattress is discussed, with the increasing population in confinement facilities and safety concerns noted as driving product demand. Id. Accordingly, the objectives or the improvements sought by the '169 Patent are described as follows:

---

[13] The ordinary and most common meaning of the term "composite" refers to something "made up of distinct parts." MERRIAM WEBSTER ONLINE DICTIONARY / www.merriam-webster.com/dictionary/composite (August 1, 2014).

[14] For purposes of the '169 Patent, "confinement facilities" includes "juvenile and adult detention facilities, prisons, jails, military brigs, and immigration detention facilities." ('169 Patent, 1, Background).

1) "to provide improved and safer articles of bedding for confinement facilities and institutions which better prevent concealment of contraband and result in improvements in detection, location, and identification of contraband items"
2) "to provide a novel mattress composite comprised of a pliable transparent cover which is useful in institutions such as hospitals and dormitories, but is particularly useful in confinement facilities"
3) "to provide a composite mattress using a polymeric transparent material that is preferably pliable, UV resistant, anti-microbial, and flame retardant with fluid resistant or impermeable properties"

('169 Patent, 1−2, Background).

### iii.    Prosecution History

The prosecution history sheds light on what the Patent Examiner understood to be covered by the '169 Patent and the relevant prior art. *Phillips*, 415 F.3d at 1317. The prosecution file establishes that CRF was initially unsuccessful in obtaining a patent for its invention.[15] (Doc. 55 / Exh. 4). Prior to obtaining the '169 Patent, CRF pursued a patent application that was subsequently abandoned, namely, application number 10/964,483 (the '483 Application"), filed October 13, 2004. ('169 Patent, Column 1, Lines 1−6; Doc. 55 / Exh. 2 / McManamy Decl., ¶ 1). After its initial application, CRF submitted a second patent application on September 7, 2005, number 11/221,338 ("the '338 Application"), as a continuation in part of the original application. Id. The '169 Patent (or '338 Application) was rejected on multiple occasions in non-final actions taken by the lead USPTO examiner. In response to USPTO scrutiny, a proposed amendment to Claim 1 of the '338 patent application originally submitted by CRF was suggested that would add the qualification, "wherein said mattress is not inflatable." (Doc. 61-2). The proposed amendment was accepted and the '169 Patent issued thereafter. Id.

CRF's proposed claim construction relies on the Patent Examiner's discussion of the disclosed prior art, namely, U.S. Patent Nos. 5,669,092, and 6,260,222 (collectively, the "Lin

---

[15] The non-final actions of the USPTO are ***not*** dispositive of claim construction, patentability, or infringement.

Patent").   The Lin Patent reference, and the Patent Examiner's discussion of the same, is the

only intrinsic evidence on the meaning of "inflatable."[16]  The mattress in Lin is described as "an

improved air mattress structure" with a multi-layer design and "water-tight and heat-insulating"

characteristics that make it suitable for outdoor use.[17] (Lin Patent, Column 1, Lines 1−14).

According to Lin, "[w]hen the improved air mattress is in use, the air valve is opened to allow

the influx of air which will then expand the nylon layer and get the air mattress inflated for use."

(Lin Patent, Column 2, Lines 18−20).  Reporting on the results of CRF's Applicant-Initiated

Interview in September 2011, the Patent Examiner explained:

> "Lin is a self inflating foam / air mattress ***that needs to inflate to be usable*** . . .
> such that specifying that the claimed device is not inflatable would be an
> ***unobvious*** modification of Lin since this would destroy the functionality thereof."

(Doc. 55-18) (emphases added).  In contrast with the '169 Patent's flexible and compressible

foam core, Lin claims an "***air mattress structure.***"[18]  (Lin Patent, Column 1, Lines 1−2; Column

3, Lines 4−18; Column 4, Lines 11).

CRF suggests that given the prosecution history, when the '169 Patent states that the

protected mattress "is not inflatable," it means that the mattress is not "inflatable" in the sense

that the Lin mattress is "inflatable."  CRF suggests that claim construction must take into

account that lack of inflatability would "destroy the functionality" of the Lin mattress as a

mattress.  In other words, CRF distinguishes a mattress that does not have to be inflatable in

---

[16]  Marx/MTJ's expert report concedes as much: "The only reference to "inflatable" is a brief
discussion of the Lin reference (US Pat No. 6,260,222) in the Examiner's Interview Summary dated
9/22/2011 . . . . As such, the Lin reference provides the only intrinsic evidence on the meaning of
"inflatable."  (Keith−Bailey, 2−3).

[17]  The descriptions provided refer to use "as a sleeping bag outdoors on a high mountain or in
cold weather" for camping, etc.; for use "as a seating mat or sleeping bag" placed on the ground. (Lin
Patent, Column 1, Lines 13−14, 21−22, 42−43; Column 2, Lines 22−23).

[18]  The '169 Patent does not utilize air and there is no mention of air within the claim language.

order to function (the CRF UNICOR mattress) from a mattress that must inflate to function as intended (Lin Patent).

CRF's proposed expert, Stephen Michielsen, Ph.D. ("Michielsen"), submitted a written report August 9, 2013 in support of this construction.[19]  (Doc. 55 / Exh. 11 – Michielsen Report). According to Michielsen, "Lin describes an inflatable air mattress that comprises a mattress body and an inflation valve that can be positively closed to prevent air entering or exiting the mattress when closed."  (Michielsen Report, 10) (internal quotation marks omitted).  Michielson emphasizes that Lin contemplates the "air mattress compris[es] an air valve for inflating the mattress and a laminated mattress body."  (Michielson Report, at 12 n. 2 / Exhs. D, E).

On the other hand, Marx/MTJ argue that the term "inflatable" should be construed as *capable of being inflated* regardless of intended use or function.  According to Marx/MTJ, because of its patented vent, the Clear Safe and Fire Safe Detention Mattresses are just as inflatable as a common balloon or a hot air balloon.  Marx/MTJ take the position that "[w]hen or how quickly the . . . mattress . . . deflates (sic) is irrelevant to initial inflation or inflatability." (Doc.   ).

In support, Marx/MTJ proffer two expert reports.  Marx/MTJ proffer an Investigative Analysis prepared July 5, 2013 by Mark J. Keith, PE, and Jonathan Bailey, both of IEC & Associates.[20]  (Doc. 50-1).  As explained by the Keith−Bailey Report ("Keith−Bailey") the MTJ

---

[19]  Michielsen has a Bachelors of Science in Chemistry from State University of New York at Stony Brook, New York, and a Ph.D. in Physical Chemistry from the University of Chicago, Illinois. Michielsen was a Postdoctoral Fellow at Stanford University, spent fifteen years working for DuPont in the areas of Polymer Products and Fibers, was an Associate Professor at Georgia Institute of Technology, Polymer, Textile & Fiber Engineering for nine years, and has been a member of the faculty at N.C. State University serving in various roles since 2004.   (Doc. 55 / Exh. 11 / Appx. 1).

[20]  Mark J. Keith ("Keith") is a registered professional engineer with over 30 years of engineering experience in industries relating to product design, forensic engineering, patent infringement and reverse engineering. Keith holds a BSEE *(Bachelors of Science in Electrical Engineering)* from Penn State

American product incorporates "a patented breathable, bidirectional air vent / valve" into the

protective cover of the mattress that accomplishes the following:

- "allows airflow into and out of the interior of the mattress"
- "is constructed to prevent the user from removing the vent and gaining access to the interior of the mattress to hide contraband"
- "can be easily inflated manually or naturally to detect compromised integrity of the cover and facilitate search and seizure of contraband"
- "allows the mattress to be externally inflated or deflated"
- "allows the mattress to naturally inflate and deflate depending on the presence or absence of an occupant"[21]

(Keith−Bailey, 2−3). Keith−Bailey opines:

"One of ordinary skill in the art would understand that Lin teaches "inflate" to mean the introduction of air, through a valve or opening, into the inside of an air mattress structure to expand and fill an internal sponge layer."

(Keith−Bailey, 3, 6). A second proposed expert for Marx/MTJ, Audie Bryan Mitcham

("Mitcham") reviewed the same materials synthesized within Keith−Bailey and also observed the

MTJ mattress in simulated operation.[22] (Doc. 50-2). In correspondence to counsel for

Marx/MTJ, Mitcham represents that he is in agreement with the Keith−Bailey findings. Id.

The Court finds that based upon the prosecution history and record as a whole, the Lin

mattress was a self inflating mattress that required air as a component of the invention necessary

to its intended use. As such, Lin necessarily contemplated trapping the air within the core to

enable the structure to inflate. Keith−Bailey acknowledges that the Lin Patent reference, and the

University and a MSECE *(Masters in Electrical / Civil Engineering)* from North Carolina State University.

[21] "Once the user removes himself from the mattress the combined effect of the external atmospheric pressure coupled with the mechanical decompression of the mattress's core re-inflates allowing air to refill the foam and return the mattress to its inflated state." (Keith−Bailey, 2−3).

[22] Mitcham holds a Bachelor of Science in Chemical Engineering from North Carolina State University and has a background in research and development and performance testing of furniture, equipment, operations, and a variety of other materials.

patent examiner's discussion and treatment of Lin, is the only intrinsic evidence probative of how the '169 Patent defines "inflatable." (Keith−Bailey, 2−3 / Appendix 1). Significantly, even Keith−Bailey recognizes that the Lin air mattress structure is designed to expand and fill with air. (Keith−Bailey, 3, 6). Nonetheless, in describing the MTJ mattresses, Keith−Bailey adopts an expansive definition of "inflatable" and loosely employs the term to advance the cause of Marx/MTJ.[23] For these reasons, the suggested CRF construction including a positive mechanism for sealing the structure (*i.e.*, a valve) is the only reasonable interpretation (as opposed to a vent that does not close or seal) of "inflatable." To the extent Marx/MTJ experts suggest a different result, the Court's construction of the claims asserted cannot be inconsistent with the prosecution history. *See Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). Indeed, the Court is required to disregard expert testimony "that is clearly at odds with ... the written record of the patent." *Key Pharms.*, 161 F.3d at 716.

In conclusion, the Court adopts CRF's proposed construction of the term "inflatable."

**c. Obviousness**

Marx/MTJ argue that the '169 Patent is invalid due to obviousness. As explained within Section 103, obviousness means that:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the

---

[23] In Appendix 3, Keith−Bailey includes suggestions for the meaning of "non inflatable." "To a person of ordinary skill in the art, there are two possible meaning[s][sic] that are the opposite of inflatable as taught by Lin

1) There is no means by which air may be introduced into the internal sponge layer of the mattress.
2) Air can be introduced into the internal sponge layer of the mattress but it will not result in the internal sponge layer being filled."

(Keith−Bailey, 11 / Appendix 3).

claimed invention as a whole would have been obvious before the effective filing
date of the claimed invention to a person having ordinary skill in the art to which
the claimed invention pertains. Patentability shall not be negated by the manner
in which the invention was made.

35 U.S.C. § 103. The relevant time period is "before the effective filing date of the claimed

invention." Id. Significantly, this inquiry is undertaken from the viewpoint of a person having

ordinary skill in the art in the relevant field. Id.

The Supreme Court recognized in *Graham v. John Deere* as follows:

While the ultimate question of patent validity is one of law, the s 103
condition, which is but one of three conditions, each of which must be satisfied,
lends itself to several basic factual inquiries. Under s 103, the scope and content
of the prior art are to be determined; differences between the prior art and the
claims at issue are to be ascertained; and the level of ordinary skill in the pertinent
art resolved. Against this background, the obviousness or nonobviousness of the
subject matter is determined. Such secondary considerations as commercial
success, long felt but unsolved needs, failure of others, etc., might be utilized to
give light to the circumstances surrounding the origin of the subject matter sought
to be patented. As indicia of obviousness or nonobviousness, these inquiries may
have relevancy.

*Graham v. John Deere*, 383 U.S. 1, 17–18 (1965) (internal citations omitted). Consideration of

these "secondary considerations" relevant to obviousness have since been deemed *a must*

(mandatory) by the Federal Circuit. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802

F.2d 1367 (Fed. Cir. 1986) ("Objective evidence such as commercial success, failure of others,

long-felt need, and unexpected results must be considered before a conclusion on obviousness is

reached . . . ."); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662–63 (Fed. Cir. 2000) ("Our

precedents clearly hold that secondary considerations, when present, must be considered in

determining obviousness."). In fact, as one treatise put it:

The obviousness determination, in short, is one of inquiry not quality. Lawsuits
arise out of the affairs of people, real people facing real problems, and nowhere is
this more true than in the obviousness setting. The Federal Circuit insists that
what it terms the "real world story" of the invention not be obscured by lawyer's

games played with the patent and the prior art. That human, real world story forms a major part of the landscape of the case and often reflects the inadequacy of the prior art and compels a conclusion of nonobviousness. Thus, obviousness must be considered in light of the problem facing the inventor.

HARMON, ROBERT L., *Patents and The Federal Circuit* § 4.2(b)(i) (Second Ed. 1991)

(internal citations omitted).

Marx/MTJ fails to produce clear and convincing evidence that the '169 Patent would have been obvious to a person of ordinary skill in the art prior to its issuance in November 2011. In support of its obviousness argument, Marx/MTJ rely on the patent examiner's non-final actions and the subsequent amendment to the '169 Patent, adding "wherein said mattress is not inflatable." (Doc. 61-2). However, the amendment to the '169 Patent only demonstrates that the challenge advanced by Marx/MTJ was squarely addressed by the USPTO. The prosecution history reveals that counsel for CRF skillfully advocated on behalf of the invention and argued that aside from the question of inflatability, the '169 Patent was not anticipated, and was not obvious, because Lin did not suggest or teach transparency or fire retardancy in the manner found in the '169 Patent, nor did Lin contemplate UV resistant and anti-microbial features. (CRF Exh. 79). Ultimately, the USPTO described the '169 Patent as an "unobvious improvement" over Lin. The findings of the USPTO are entitled to a certain amount of deference as it is the technical expertise of the USPTO that justifies the statutory presumption of validity upon issuance of a patent. 35 U.S.C. § 282(a). Marx/MTJ ignore the fact that, in the end, the lead USPTO examiner was persuaded that the '169 Patent was distinct enough from the prior art to be patentable.

In this case, the "real world story" compels the conclusion that the '169 Patent would not have been considered obvious prior to issuance of the '169 Patent. Indeed, it took McManamy

and Ogburn nearly nine years to develop the CRF UNICOR Mattress. The need to improve upon the mattresses previously used in confinement facilities is detailed within the '169 Patent and is not contested. Moreover, the commercial success experienced by CRF, as well as the success experienced by MTJ with its competing product, tend to support CRF's argument that the '169 Patent met the desired goals. The demand for the CRF product protected by the '169 Patent is well established in the record.

As discussed, *supra*, the Lin Patent covers an inflatable air mattress while the '169 Patent, which is not inflatable, protects a solid core mattress. Given this fundamental distinction between Lin and the '169 Patent, and the lesser distinctions outlined by the Michielsen Report, the Court is of the view that no jury could reasonably find that the '169 Patent would have been obvious to a person of ordinary skill in the art prior to November 15, 2011. For these reasons, and particularly the statutory presumption of validity, 35 U.S.C. § 282(a), the Court finds, as a matter of law, that the '169 Patent is, in fact, valid and enforceable by CRF.

**d. Direct Infringement**

CRF contends that the *Clear Safe Detention* and *Fire Safe Detention* mattresses produced and marketed by MTJ infringe upon the '169 Patent. Section 271 of Title 35 provides that:

> "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent."

35 U.S.C. § 271(a). In order to survive summary judgment on its Counterclaim alleging patent infringement, CRF must produce evidence that Marx/MTJ "makes, uses, offers to sell, or sells any patented invention" [its '169 Patent], and does so without authority. 35 U.S.C. § 271(a).

Typically a matter for the jury, infringement requires that each element (or limitation) of a claim, or its substantial equivalent, be found in the accused device. *See Pennwalt Corp. v.*

*Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed. Cir. 1987) (*en banc*), cert. denied, 485 U.S. 961, (1988).

According to CRF, the specification sheets for MTJ's Clear Safe and Fire Safe Detention Mattresses demonstrate infringement of each and every claim of the '169 Patent as a matter of law.  (Doc. 55, 5−9) (Compare Exh. 1 / '169 Patent with Exhs. 5 and 7 / Specification Sheets for MTJ Clear Safe and Fire Safe Detention Mattresses).  Indeed, Michielsen opines that "MTJ is practicing the '169 Patented technology in their Clear Safe Detention and Fire Safe Detention mattresses."  (Michielsen Report, 9).  Michielsen's Report includes a chart identifying the evidence in support of infringement as to Claims One, Two, and Three, which is instructive.[24] (Michielsen Report, 5−9).

MTJ's primary argument concerning infringement is that ALL of MTJ's competing product (fire safe mattresses) are designed *and advertised* as "inflatable" while CRF's '169 Patent expressly states in Claim One that the CRF mattresses are not inflatable.  ('169 Patent, Column 4, 1−2; Column 2, 21−23).  Keith−Bailey opines that the MTJ American mattresses do not infringe as alleged by CRF.  The thrust of Keith−Bailey is that the MTJ American mattress, because of its patented vent, "operates in similar fashion to the valve of [the] Lin [Patent]." (Keith−Bailey, 3).  In other words, Marx/MTJ contend the MTJ mattresses are "inflatable" (can self inflate) whereas the '169 Patent expressly disclaims this characteristic.  Audie Mitchum concurs with Keith−Bailey.[25]

---

[24] The Michielsen Report states that the MTJ product is marketed as being appropriate "for use in "detention" facilities" since the MTJ mattresses are "covered in a flame retardant, transparent material just like that described in the '169 Patent."  (Michielsen Report, 2).  Michielsen also describes the options for both of the relevant MTJ mattresses, including the clear or transparent cover and a pillow option similar to that described in the '169 Patent.  Id.

[25] Relevant to alleged infringement of Claim 2 of the '169 Patent, Mitcham contends that the MTJ mattress cover did not need to be transparent or translucent in order for contraband in the mattress to

With respect to infringement, it is the view of the Court that whether MTJ "makes, uses, offers to sell, or sells any patented invention [the '169 Patent] within the United States" presents genuine issues of material fact.

Marx/MTJ market their Clear Safe and Fire Safe Mattresses as having a "patented vent" and the MTJ American website represents that an unidentified patent is pending. (Doc. 55 / Exh. A – MTJ Webpage). Michielsen contends that the "patented vent" is the subject of two patent applications, the '498 and '575 Applications, but no registered patent.[26] (Doc. 55 / Exh. A – MTJ Webpage; Michielsen Report, 9, 11). According to Michielsen, the Marx/MTJ experts have not identified "any other relevant distinction" between MTJ's product and CRF's; that if the jury were to find that the MTJ Clear Safe and Fire Safe Mattresses, notwithstanding the "patented vent," are *not* inflatable, there is no serious contest concerning the commonalities / similarities between the other components of the CRF and MTJ mattresses. (Michielsen Report, at 13). Nonetheless, the jury − not this Court − will determine if the Clear Safe and Fire Safe Detention Mattresses infringe upon the '169 Patent.

Summary judgment is denied on this issue.

### 4. Contributory Infringement / Sales or Attempted Sales

In addition to alleging direct infringement by way of MTJ's manufacturing of the

---

be detected because the design of the MTJ mattress was such that "the primary method of detection of contraband inserted within the mattress cavity is the self-evidence of the lack of inflatability due to a violation, *such as a cut or tear, of the non-porous mattress cover that allows the air contained within the mattress volume to be expelled quickly rather than displaced within the confined mattress volume when struck by a rapidly applied external force, such as a punch or kick*."

[26] The Michielsen Report suggests that the purported "patented vent" is not the subject of any registered patent − only patent applications. (Michielsen Report, 9, 11). Michielsen takes issue with the legal argument of Marx/MTJ that the vent in the MTJ mattresses is more akin to the Lin mattress than the CRF mattress because its product has a "bidirectional valve" rather than a vent because the term "bidirectional valve" is allegedly not found anywhere on the MTJ website.

purported infringing product, CRF alleges that Marx is a contributory infringer.  (Doc. 55, 8– ).

Pursuant to 35 U.S.C. § 271(c),

> *[w]hoever offers to sell or sells* within the United States . . . *a material . . . for use in practicing a patented process, constituting a material part of the invention*, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, *shall be liable as a contributory infringer*.

35 U.S.C. § 271(c) (emphases added).  This issue will be for the jury.  The jury will decide whether Marx's production of foam, or other contribution to the MTJ mattress manufacturing, affects a material part of the patented invention, and whether Marx had knowledge that the foam it manufactures and / or the foam used in the MTJ's mattresses was made or especially adapted for an infringing use.  Mark Kiser's relationship with Marx/MTJ, as well as the common ownership, may be considered on this issue.

### B.  Marx's Unexecuted "Confidential Discussion Document, Representations, Indemnity and Confidentiality Agreement"

Both Marx and CRF move for summary judgment on all of the issues raised within Marx's Declaratory Judgment Action, including the claims stemming from Marx's purported "Confidential Agreement" with IFP.

From the outset of the litigation, Marx has asserted that its "Confidential Agreement" with IFP, or rather its "Confidential Discussion Document," provided Marx/MTJ with the authority to both purchase the equipment from IFP and utilize the equipment, along with the consulting services provided by IFP personnel, to manufacture the foam mattresses accused of infringing the '169 Patent.  Beyond the defensive posture Marx took with respect to its "Confidential Agreement," Marx also advances a tortious interference claim against CRF.

On the issue of contract formation, the CDD does not include any choice of law

provision.[27]  Absent an agreement to the contrary, the substantive law of the forum state is applied in diversity cases.  *Caper Corp. v. Wells Fargo Bank, N.A.*, 2014 WL 3511928, * 5 (4th Cir. 2014) (internal citations omitted).  Because this lawsuit was removed to this Court on the basis of diversity jurisdiction, the substantive law of North Carolina applies.  Under North Carolina law, the law of the place where a contract was made (*lex loci contractus*) governs a contract dispute.  *See Fast v. Gulley*, 155 S.E.2d 507, 509–10 (N.C. 1967)).  The facts show that the contract was never made.

On this record, even when the facts and inferences are viewed in the light most favorable to Marx/MTJ, it is doubtful Marx/MTJ can sustain any affirmative action for relief, including its tortious interference claim, by relying on the unexecuted CDD.  *See e.g, Gupton v. Son-Lan Development Co., Inc.*, 695 S.E.2d 763, 770 (N.C. App. 2010) (reciting elements of tortious interference, including showing that interference was not justified by any legitimate business interest).  Aside from the fact that the document is unexecuted, the label chosen is probative of the parties' intent and tends to show that the parties had not finalized their discussions, but were still in discussion.  In short, the evidence presented by Marx/MTJ thus far is insufficient to establish the terms of any enforceable contractual agreement between Marx and IFP and former IFP executives.[28]  *At best, Marx could try to make out a claim for tortious interference with a prospective contract or prospective advantage*.  *See Gupton*, 695 S.E.2d at 770 ("[T]he general rule prevails that unlawful interference with the freedom of contract is actionable whether it

---

[27]  The only reference to a specific court within the CDD is to "a court of competent jurisdiction located in Caldwell County, North Carolina," which is the forum where Marx originally filed its declaratory judgment action.  (Doc. 94, 3, ¶ 7).  The Caldwell County reference pertains to Marx's claim that the CDD is "the exclusive property of Marx" and the need for a court to order Marx to produce a copy of the CDD prior to disclosure to any IFP parties.  *Id.*

[28]  The relationship between Marx/MTJ and IFP, and IFP's indemnification of Marx/MTJ, is not directly before this Court as IFP is not a party.

consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant's own rights, but with design to injure the plaintiff, or gaining some advantage at his expense.") (quoting *Coleman v. Whisnant*, 35 S.E.2d 647, 656 (1945)).

There is no evidence of record to enlighten the Court about the nature of IFP's work for Marx/MTJ.[29] The CDD states that IFP's "consulting and manufacturing services" for Marx would be "on a confidential contract basis." (Doc. 94, at 1). Therefore, the purported "Confidential Agreement," initially touted by Marx/MTJ as its defense to CRF's claims of infringement and the basis for its declaratory judgment action, is of little probative value in terms of determining whether Marx/MTJ infringed on the '169 Patent, or whether there was any interference by CRF. Potentially, the "Confidential Discussion Document" is probative of factual questions such as the authority Marx/MTJ thought it possessed and / or the willfulness of Marx/MTJ's alleged unlawful actions (*e.g.*, patent infringement, violation of the Lanham Act).

## C. CRF Claim Alleging Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

Marx/MTJ move for summary judgment on CRF's counterclaim alleging violation of Section 43(a) of the Lanham Act by Marx/MTJ. First, CRF contends that Marx / MTJ have engaged in the "misrepresentation of nature, characteristics or qualities of goods or services which constitutes a false designation of origin, false or misleading description or false representation of fact, each of which is likely to cause confusion, mistake or deception among consumers that Marx/MTJ are licensed, sponsored, approved, associated with or otherwise entitled to use Chestnut's [] designs." (Doc. 19 ¶ 56). Secondly, CRF contends that Marx / MTJ

---

[29] According to the document, Marx was to execute the Confidential Agreement "for and on behalf of itself and related businesses containing common ownership . . . ," namely, MTJ. (Doc. 94, at 1).

violated the Lanham Act by engaging in "unfair competition, false advertising, false designation of origin, false description and false representation that their products are sponsored, approved or authorized by Chestnut." (Doc. 19 ¶ 57).  CRF claims Marx /MTJ acted willfully and deliberately.  (Doc. 19 ¶ 60)

Section 43(a) of the Lanham Act imposes liability on one who engages in false advertising, by making false description or representation about one's own, or another's goods or services.  *See* 15 U.S.C. § 1125(a)(1)(B); *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir.1997).  A representation constitutes a violation of the Lanham Act when it is "false on its face, or although literally true, likely to mislead and to confuse consumers given the merchandising context."  *C.B. Fleet*, 131 F.3d at 434.  If an advertising claim is literally false, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public."  *Id.*  (citing *McNeil-P.C.C., Inc. v. Bristol-Meyers Squibb Co.*, 983 F.2d 1544, 1549 (2nd Cir.1991); *Buffalo Wings Factory, Inc. v. Mohd*, 622 F.Supp.2d 325, 334 (E.D.Va.2007).

In order to succeed on its Lanham Act counterclaim, CRF must establish the following:

> 1) that Marx / MTJ made a false or misleading description of fact or representation of fact in a commercial advertisement about its own or another's product;
> 2) that the misrepresentation is material - likely to influence the purchasing decision;
> 3) that the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;
> 4) that Marx / MTJ placed the false or misleading statement in interstate commerce; and
> 5) that CRF has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002).

Because the gist of CRF's Lanham Act counterclaim is Marx / MTJ's alleged

misrepresentation(s) regarding their ability to manufacture and sell the Clear Safe and Fire Safe

Mattress products, genuine issues of material fact exist and preclude summary judgment on this

issue.

### C. Competing Alleged Violations of NC's Unfair & Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1

Under North Carolina's Unfair and Deceptive Trade Practices Act, a successful plaintiff

must show: "(1) defendants committed an unfair or deceptive act or practice; (2) in or affecting

commerce; and (3) that plaintiff was injured thereby." *Gupton*, 695 S.E.2d at 771 (quoting

*Carcano v. JBSS, LLC*, 684 S.E.2d 41, 49 (2009)). "Whether an act or practice is unfair or

deceptive under this section is a question of law for the court." Id. (quoting *Carcano*, 684 S.E.2d

at 50.) "Additionally, 'it is not necessary that an act or practice be both unfair and deceptive in

order to be violative of the statute.'" Id. (quoting *Rucker v. Huffman*, 392 S.E.2d 419, 421

(1990)) (emphasis in original).

"A practice is unfair when it offends public policy and when the practice is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gupton*, 695

S.E.2d at 771 (quoting *Walker v. Branch Banking & Tr. Co.*, 515 S.E.2d 727, 729 (1999)).

"Stated another way, a party is guilty of an unfair act or practice when it engages in conduct

which amounts to an inequitable assertion of its power or position." Id. (quoting Carcano, 684

S.E. 2d at 50.)) "A practice is deceptive if it has the capacity or tendency to deceive." Id.

(quoting Huff v. Autos Unlimited, Inc., 477 S.E.2d 86, 88 (N.C.Appp. 1996)).

The parties' factual allegations concerning whether any party has engaged in conduct that

might constitute an unfair or deceptive trade practice in violation of North Carolina's Unfair &

Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, is dependent in large part upon the

findings concerning the '169 Patent and infringement. For example, Marx / MTJ contend in the

declaratory judgment action that much of CRF's conduct in seeking to protect its '169 Patent violates § 75-1.1. In a similar vein, CRF contends that Marx / MTJ violated the statute via sales of infringing products, specifically, the infringement of the '169 Patent and any other intellectual property, trade secrets and confidential proprietary information of Chestnut Ridge. CRF also contends that Marx initiated litigation "for the purpose of casting a cloud over Chestnut Ridge's exclusive right, title and interest in and to its valid United States Patents, trade secrets and / or confidential proprietary information."[30]

For this reason, the § 75-1.1 statutory claims, which are asserted by the parties against each other, are not subject to resolution on summary judgment.

### D. Laches

"The purpose of a laches defense is to punish dilatory patentees and in so doing to encourage all patentees to seek infringement remedies in a timely manner." *Odetics, Inc. v. Storage Tech. Corp.*, 14 F.Supp.2d 785, 790 (E.D.Va.1998).

To succeed on a laches defense to a claim alleging patent infringement, a party must show that "(a) the patentee's delay in bringing the suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay."[31] *Troxler*, 597 F.Supp.2d at 583 (quoting *Wafer Shave, Inc. v. Gillette Co.*, 857 F.Supp. 112, 118 (D. Mass. 1993), *aff'd without opinion*, 26 F.3d 140 (Fed. Cir. 1994)).

"[A] defense of laches requires the court to look at the patentee's conduct from the

---

[30] CRF's characterization of Marx's motive is akin to Marx's original description of CRF's purpose in writing Marx and taking steps to protect its proprietary interest within the complaint for declaratory judgment.

[31] In *Troxler*, the court granted summary judgment as to the unreasonableness of delay in favor of the accused infringer where the patentee delayed asserting its patent for approximately five years, patentee represented he *"didn't feel motivated to pursue"* patent rights earlier, and did not assert patent until litigation ensued. The question of prejudice proceeded to trial.

patentee's perspective and also to consider its effect on the alleged infringer." Id. The length of time that may be deemed reasonable depends on the circumstances. *Aukerman*, 960 F.2d at 1032. Furthermore:

> [t]he time of the delay is measured from when the patentee knew or should have known of the alleged infringement. A presumption of laches arises if the delay is more than six years, the effect of which is to shift the burden of going forward with the evidence, but not the burden of persuasion, to the patentee.

*Id.* (quoting *Wafer Shave*, 857 F.Supp. at 118.)

A court must also consider and weigh any justification offered by the plaintiff for its delay. *Aukerman*, 960 F.2d at 1033. These justifications could include, but are not limited to: 1) other litigation; 2) negotiations with the accused; 3) possible poverty or illness under limited circumstances; 4) wartime conditions; 5) the extent of the infringement; and 6) a dispute over the ownership of the asserted patent. Id.

"The defense of laches is committed to the sound discretion of the trial judge." *Troxler Electronic Laboratories, Inc. v. Pine Instrument Co.*, 597 F.Supp.2d 574, 583 (E.D.N.C. Feb. 13, 2009) (internal citations omitted). "A successful laches defense bars all damages incurred before the filing of the suit." *Id.*

### E. Alleged Failure To Mark Patent As A Potential Limitation On Remedies For Infringement

Marx/MTJ assert that CRF failed to mark its product as contemplated by 35 U.S.C. § 287, which imposes limitations on damages and other remedies in a patent infringement action where no notice is provided by the patentee to the accused infringer. Section 287, entitled "Limitation on damages and other remedies; marking and notice," reads:

> (a) Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, . . . ***may give notice to the***

> *public that the same is patented*, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. ***In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice***. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287 (2011) (emphases added). Marking is not required. Id. A patentee's election to physically mark its product with the patent number or information directing the public to the patent information is one way to provide notice to the public of the patentee's patent ownership rights.

The limitation of damages issue raised by the Marx/MTJ summary judgment motion for CRF's alleged failure to mark its patent is simply not ripe. CRF's patent infringement claim, and its corresponding motion for summary judgment asserting infringement by Marx/MTJ, was explicitly limited by CRF to liability. This issue will be deferred pending jury trial.

**F. Unfair Competition, Unjust Enrichment, Civil Conspiracy**

CRF's claims alleging unfair competition, unjust enrichment, and civil conspiracy are based entirely on the factual allegations asserted in other causes of action. (Doc. 22, ¶ 51). For example, CRF's claim alleging unjust enrichment is based upon the assertion that Marx / MTJ engaged in sales (or attempts to sell) of products that infringe on CRF's mattresses and that Marx / MTJ should not be permitted to benefit from those wrongful sales. (Doc. 22, ¶¶ 38−39). CRF's

unjust enrichment is dependent upon the jury's findings as to patent infringement. The same is true with respect to CRF's civil conspiracy claim, which alleges that Marx / MTJ acted in combination with common purpose to devalue Chestnut's name in the market and seize a portion of market share via unfair and unlawful means of competition. (Doc. 19 ¶¶ 64, 66). Summary judgment disposition is precluded.

### G. Trade Secret Misappropriation

Marx / MTJ also requested declaratory judgment stating that CRF has no protectable trade secrets and that Marx / MTJ have not violated either of the Pennsylvania or North Carolina Trade Secret Protection Acts.[32] The Marx/MTJ claims concerning trade secret misappropriation under either the North Carolina or Pennsylvania statute find no support in the record and are deemed to be abandoned or waived.

### IV. Order

For the reasons stated herein, the Court finds that genuine issues of material fact exist and preclude summary judgment disposition on all issues identified within the instant Memorandum and Order and listed below. In light of the genuine issues of material fact, the following claims or counterclaims will proceed to jury trial:

- Marx's declaratory judgment action seeking guidance concerning the parties' respective proprietary interests and related rights and obligations

---

[32] As far as trade secrets are concerned, Marx/MTJ has not identified any particular trade secret for the Court to consider in connection with the declaratory judgment action. CRF has not filed any counterclaim for misappropriation of trade secrets. Rather, the focus of the parties has been the purported "Confidential Agreement" (the CDD) relied upon by Marx/MTJ and the '169 Patent asserted by CRF. Accordingly, the Court finds that all matters concerning trade secrets – the existence of trade secrets as well as any alleged misappropriation – are deemed to be abandoned or waived.

- Marx's declaratory judgment action asserting violation of NCGS § 75-1.1

- CRF's counterclaim alleging direct and contributory infringement of the '169 Patent

- CRF's counterclaim alleging violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

- CRF's counterclaims alleging unfair competition, violation of NCGS § 75-1.1, unjust enrichment, and civil conspiracy

**IT IS, THEREFORE, ORDERED THAT:**

1) Marx's Motion for Summary Judgment is hereby **DENIED**;

2) MTJ's Motion for Summary Judgment is hereby **DENIED**;

3) CRF's Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part consistent with the terms of this Memorandum and Order**;

4) The Deputy Clerk is directed to place this civil action on the Court's **January 2015 TRIAL CALENDAR** in the Statesville Division;

5) Counsel shall appear at Calendar Call on Monday, January 5, 2015 at 10 AM;

6) Jury Selection will occur on Tuesday, January 6, 2015 at 9:30 AM and counsel are expected to be present for the entire *voir dire* process regardless of the number of other trials (whether criminal or civil) to be heard during the term of court;

7) Defendant / Third-Party Plaintiff CRF's Motion to Compel (Doc. 90) is **GRANTED**;

8) Defendant / Third-Party Plaintiff CRF's Motion for Sanctions will be **DEFERRED** until the conclusion of trial;

9) Defendant / Third-Party Plaintiff CRF's Motion to Strike Affidavits of Mark Kiser (Doc. 64) is **DENIED**;

10) Marx / MTJ's Motion to Schedule for Trial, Motion for Limited Discovery, and Motion for Trial Depositions is **GRANTED in part** and **DENIED in part**. The case is to be scheduled for trial in January 2015 and so the trial setting aspect of the motion is <u>granted</u>. However, the request for limited discovery and trial depositions is <u>denied</u>.

11) The parties shall submit Amended Proposed Jury Instructions by Monday, December 22, 2014.

Signed: October 29, 2014

Richard L. Voorhees
United States District Judge